UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DANIEL B. KARRON,

                        07 Cr. 541 (RPP)
                        11 Civ. 1874 (RPP)

                Petitioner,

                        **OPINION AND ORDER**

      - v. -

UNITED STATES OF AMERICA,

                Respondent.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR. U.S.D.J.**

      On March 22, 2011, Petitioner Daniel B. Karron ("Karron" or "Petitioner"), pro se, filed a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct her sentence arising from her conviction at trial on a one count indictment, charging a violation of 18 U.S.C. § 666. Petitioner seeks to vacate her sentence on the grounds that (1) she received ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution; (2) the Government failed to disclose exculpatory evidence prior to trial in violation of Brady v. Maryland, 373 U.S. 83 (1963); and (3) she is actually innocent based on newly discovered evidence.

**I.     Procedural History**

      On May 21, 2008, the Government filed a one count superseding indictment ("Indictment") against Petitioner, charging her with intentionally and knowingly misapplying more than $5,000 of federal funds owned by and under the care, custody, and control of Computer Aided Surgery, Inc. ("CASI"), a company at which Petitioner was the owner, President and Chief Technical Officer, (Trial Transcript ("Tr.") at 107, 253, 624, 963), and that CASI received more than $10,000 in federal funds during a one-year period, in violation of 18

1

U.S.C. § 666.  After a ten-day jury trial ending on June 11, 2008, the jury convicted Karron of the single count in the Indictment.  On October 27, 2008, Karron was sentenced to seven and one-half months home-confinement, followed by seven and one-half months imprisonment, followed by three years of supervised release, as well as $125,000 in restitution. (Amended Sentencing Judgment, Oct. 31, 2008, ECF No. 71.)  On October 29, 2008, Karron appealed from her judgment of conviction and on October 7, 2009, the Second Circuit affirmed the judgment of this Court. United States v. Karron, 348 Fed. App'x. 632 (2d Cir. 2009).  On January 4, 2010, Karron filed a petition for certiorari in the United States Supreme Court, which was denied on February 22, 2010. Karron v. United States, 130 S. Ct. 1555 (2010).

Karron filed this § 2255 motion on February 22, 2011, and submitted a revised accompanying memorandum of law on April 28, 2011. (Petitioner's Revised and Resubmitted Mem. to Accompany Mot. to Vacate Criminal Verdict ("Pet'r Mem.").)  On July 16, 2011, the Government filed a memorandum in opposition to Karron's § 2255 motion. (Gov't Mem. in Opp. to Def.'s Mot. ("Gov't Mem.").)  Karron filed a "corrected sur-reply" memorandum on December 2, 2011.  (Corrected Sur-Reply Memorandum of Fact and Law ("Reply").)  The Government filed its response to Karron's "corrected sur-reply" on February 1, 2012. (Gov't Resp. to Def.'s Corrected Sur-Reply in Supp. of the § 2255 Mot. ("Gov't Resp.").)

**II.    Background**

In October 2001, CASI received a federal grant of $2 million, under the Advanced Technology Program ("ATP"), to be disbursed over the course of three years, designed to support high-risk scientific research (the "Grant"). (Gov't Ex.'s 11, 13; Tr. at 56.)  The National Institute of Science and Technology ("NIST"), the U.S. Department of Commerce agency that administered the Grant, required grant recipients to follow spending-related "rules and

regulations," including adherence to a NIST-approved budget (a detailed budget narrative that spelled out the amount of money to be spent in each budget category) and a general prohibition on using federal funds to pay for items or services not included within the approved budget without written approval. (Tr. at 87, 265.) In addition, the Grant's funding "principles," included: (1) a prohibition on paying for "indirect costs," i.e. overhead expenses that did not relate to the research and (2) a prohibition on reimbursement for "sunk costs," i.e. costs incurred before the start of the Grant period. (Id. at 88, 298.)

Bettijoyce Lide ("Lide"), a NIST employee responsible for supervising the Grant, and Hope Snowden ("Snowden"), a NIST employee responsible for reviewing CASI's budget submissions, each testified to advising Petitioner, both prior to and during the administration of the Grant, about the rules of adhering to the budget and the need for prior written approval for any change in budgeted expenses of over ten percent or changes in key personnel, the rule against expenditure of Grant funds for "indirect costs," and the rule against disbursement of Grant funds for "sunk costs." (Id. at 88-89, 108-09, 257-59.) Despite repeated warnings from the NIST officials (Lide and Snowden) who administered the Grant, (id. at 122-23, 259), as well as several warnings to Petitioner from fellow CASI employees, (id. at 637-38, 840-42, 978-79), Petitioner used the money received from the ATP to pay pre-Grant rent as well as utilities, home renovation expenses, restaurant meals, and miscellaneous household items during the Grant period, in violation of the Grant's funding principles outlined above. (Gov't Ex.'s 101, 110, 114, 115). At trial, the Government presented testimony and evidence that it was Karron, the sole signatory on CASI's bank accounts, (Tr. at 299-302), who misapplied the Grant funds (id. at 638-39).

In addition, Belinda Riley ("Riley"), an auditor for the U.S. Department of Commerce,

Office of the Inspector General ("OIG"), who analyzed CASI's financial records, was called by the Government as an expert in accounting and auditing procedures to facilitate the jury's review of the financial records submitted into evidence. (Id. at 462, 464-65.) In May and June of 2003, Riley conducted a preliminary audit of CASI at the request of NIST to "determine the financial status of the grant project." (Id. at 466; Gov't Ex. 60; Tr. at 140-42.) Riley based her audit on documents (i.e. ledgers, records, and books) provided by CASI, (Tr. at 468-69, 518; Gov't Ex. 60 at 2), and filed a final audit report with the OIG on August 25, 2004 (Gov't Ex. 62; Tr. at 516). Riley also created a database covering the time period from the Grant's start date on October 1, 2001 to June 2003 (Gov't Exs. 110, 111), based on CASI's bank account records at J.P. Morgan Chase Bank ("Chase Bank") (Gov't Ex. 81), American Express credit card statements for CASI (Gov't Ex. 90), and bank account records at Chase Bank for Petitioner (Gov't Ex. 80). Regarding her analysis, Riley testified that, with a few small exceptions, the Grant was CASI's only source of funding, (Tr. at 548-49), that CASI's bank and credit card accounts were used by Petitioner for disallowable expenses, i.e. rent, cleaning services, and miscellaneous household items for CASI, (id. at 533, 537-38, 544, 555-58; see Gov't Exs. 110, 114), and that over an eighteen-month period, Karron misapplied approximately $465,000 (Tr. at 552-55). Based on Riley's preliminary audit NIST suspended CASI's Grant on June 27, 2003 – eighteen months after it was initially funded. (Tr. at 149-50; Gov't Ex. 26 at 6.)

Testimony and exhibits at trial also showed that Karron's misapplication of the Grant funds was intentionally and knowingly made. In July 2002, Frank Spring ("Spring"), a bookkeeper, testified that he was hired by CASI to assist on preparing the books for the ATP audit at the end of the Grant's first year. (Id. at 835.) Spring testified that he was asked by Petitioner to use Quicken, a bookkeeping software program, to examine Petitioner's personal

4

financial records going as far back as April 2001 (six months prior to the Grant's October 1, 2001 start date) and to charge certain expenses from those records to the Grant. (Id. at 837-38.) Spring also testified that he had a series of conversations with Petitioner after he noticed that certain non-Grant-related expenses were improperly included as Grant expenses in CASI's books and records. (Id. at 840-42.) Petitioner scolded Spring for not knowing what he was doing and told him that she was "in conversation with the [Grant] managers in Washington to ensure that these expenses . . . would be allowed." (Id. at 840-42.) With respect to Karron's use of Grant funds for the rent payments for her midtown Manhattan apartment,[1] CASI's bank records at Chase Bank showed that Petitioner drew a total of thirty checks, payable to herself, for $2,000 each, (Gov't Ex.'s 81, 110; Tr. at 530, 533); the checks contained notations designating each as monthly rent payments, eighteen of which contained notations designating them as back rent for months prior to the Grant's October 1, 2001 start date (Gov't Ex. 81; Tr. at 755-57). Spring also testified that Karron told him that she intended to "tell the ATP managers that [s]he lived in Connecticut" with a friend, despite the fact that she was living in the Manhattan apartment. (Tr. at 854-55.) In an e-mail dated December 18, 2002, Karron told a friend: "I will make a lease with Windy [Farnsworth in Connecticut] and make like I only keep a folding bed on 33rd Street [Karron's midtown Manhattan apartment]. If ATP buys into this idea, then I can charge my rent on the apartment to the grant and pay my mortgage." (Gov't Ex. 213.) Farnsworth testified that Karron never lived with her in Connecticut. (Tr. at 1187.)

CASI's former business managers, Lee Gurfein (2001-2002) and Robert Benedict (2003), also testified that despite their repeated warnings, Petitioner continued to use Grant funds to pay for non-Grant-related expenses without written approval from NIST. (Id. at 643, 981-82.)

---

[1] Karron owned the apartment located at 300 East 33rd Street, Unit 4N, New York, NY, (see Endorsed Letter, Apr. 3, 2008, ECF No. 36), which became CASI's office address (see Def.'s Ex. F; see also Tr. at 533).

5

Benedict further testified that he and Spring reported Karron's conduct to CASI's Board of Directors, which then deprived Karron of her CASI checkbook. (Id. at 978-79.) Karron circumvented the restriction by using PayPal, an online service that allows the user to pay bills by credit card. (Id. at 979-80.)

### III. Legal Standard

Section 2255 of Title 28 of the United States Code provides, in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside, or correct the sentence.

28 U.S.C. § 2255. "[P]risoners seeking habeas relief must not only prove that constitutional violations occurred at trial, but also that such errors caused substantial prejudice or a fundamental miscarriage of justice." Ciak v. United States, 59 F.3d 296, 301 (2d Cir. 1995).

Karron is proceeding pro se, and thus the submissions will be "liberally construed in [her] favor," Simmons v. Abruzzo, 49 F.3d 83, 87 (2d Cir. 1995) (citing Haines v. Kerner, 404 U.S. 519, 520 (1972), and read "to raise the strongest arguments that they suggest," Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (internal citation omitted). See also Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001).

### IV. Discussion

#### A. Ineffective Assistance of Counsel

Karron claims that her counsel was ineffective for several reasons. First, Petitioner argues that counsel adopted a flawed defense strategy by arguing that Petitioner lacked criminal intent. (Id. at 86, 88, 106.) Second, she argues that counsel failed to "confront" an uncalled

6

witness, Joan Hayes ("Hayes"), whom Petitioner asserts was "hostile" to her. (Pet'r Mem. at 95; Reply at 18-19.) Third, she argues that counsel failed to suppress Government Exhibit 114. (Pet'r Mem. at 95, 106; Reply at 17-18.) Fourth, she alleges – without citing to any evidentiary support – that her counsel failed to prepare adequately for trial until four days before trial, when he had received an additional court-mandated retainer from the sale of Petitioner's apartment. (Pet'r Mem. at 84-85.) Finally, Petitioner argues that counsel's computer illiteracy rendered him "unreasonable" for a defense which involved the financial records and other "data" on Petitioner's computer. (Id. at 86.) In opposition, the Government contends that "Karron fails to establish that her trial counsel's conduct was unreasonable or that she suffered any prejudice from such conduct." (Gov't Mem. at 13-14.)

### 1. Ineffective Assistance of Counsel Standard

#### a. Deficient Performance

To establish a claim for ineffective assistance of counsel, a petitioner must demonstrate that "counsel's performance was deficient," and that counsel's "deficient performance prejudiced the petitioner." Strickland v. Washington, 466 U.S. 668, 687 (1984). A deficient performance is one that falls "below an objective standard of reasonableness" under "prevailing professional norms." Id. at 688. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment." Id. at 690. Counsel's conduct is also presumed to fall within "the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case." United States v. Aguirre, 912 F.2d 555, 560 (2d. Cir. 1990) (internal citation omitted).

#### b. Prejudice to Petitioner

The deficiency in counsel's performance must also have had an effect on the result; the

error must have been prejudicial to the petitioner. Strickland, 466 U.S. at 691-96. Prejudice to the petitioner is demonstrated by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 687, 694. A reasonable probability exists when confidence in the outcome is undermined. Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994). A showing that counsel's errors had "some conceivable effect" on the result is insufficient. Strickland, 466 U.S. at 693.

2. **Petitioner's Ineffective Assistance of Counsel Arguments**

a. **Counsel Failed to Utilize Forensic Accounting Analysis**

Petitioner contends that counsel employed a flawed strategy by arguing that Petitioner lacked the requisite criminal intent to commit the crime charged. Petitioner argues that her counsel's decision to pursue this defense strategy was improper in light of United States v. Urlacher, 979 F.2d 935, 938 (2d Cir. 1992), which held that to violate 18 U.S.C. § 666, a defendant need not have an intent to defraud the Government. Petitioner misrepresents the holding of Urlacher. While a violation of 18 U.S.C. § 666 does not require an intent to defraud the Government, it does require an intent to misapply government funds for otherwise legitimate purposes. See Urlacher, 979 F.2d at 938 (emphasis added). Instead, Petitioner asserts that counsel should have pursued a defense theory that the "funds considered misappropriated were in fact property of Karron and did not belong to the government." (Pet'r Mem. at 25.) In this vein, Petitioner argues that her counsel failed to "provide and convincingly argue a forensic foundation upon which to trace ownership of the funds used to pay for indirect or unallowable payments." (Id.) Specifically, Petitioner alleges that counsel failed to utilize forensic analysis of

8

"accounting experts [Melvin] Spitz[2] and [Deborah] Dunlevy[3] because of conflicts over counsel and accounting fees." (Id. at 26.) Petitioner argues that this analysis would have provided the jury with an "alternate theory of Karron's spending" and "brought key forensic points to the attention of the Court and Jury that would have resulted in an innocent verdict." (Id. at 90-91.) Petitioner states that Dunlevy "had prepared extensive forensic exhibits and analysis of CASI spending and Karron funding, that Counsel refused [to] pay for and pay attention to." (Id. at 91.)

In support of this assertion, Petitioner provides excerpts from the Declaration of Deborah Dunlevy ("Dunlevy Decl.") dated August 23, 2010. (United States v. Karron, 08 Civ. 10223, ECF No. 32; Reply, Ex. D.) In this Declaration, which was initially submitted by Petitioner in the Government's civil case against her to recover damages under the False Claims Act, see United States v. Karron, 750 F. Supp. 2d 480 (S.D.N.Y. 2011), Dunlevy states that it contains a "comprehensive forensic reconstruction" of CASI's records by Dunlevy. (Dunlevy Decl. at 3 ¶ 1.) The timestamps, however, on Dunlevy's computer generated charts and graphs show that Dunlevy's reconstruction was printed in July and August of 2010. (Dunlevy Decl. Parts 2-20.) Petitioner provides no affidavits containing any factual support that her counsel had access to this analysis prior to, or during her criminal trial in June of 2008.

Furthermore, the trial minutes reveal that Petitioner's counsel's decision to not call the forensic accounting experts was sound. His examination of Riley cast considerable doubt as to

---

[2] Melvin Spitz is a C.P.A. who was hired by CASI in 2003. (United States v. Daniel Karron, 07 Cr 541, ECF No. 46 at 2.) Petitioner's counsel notified the Court that Spitz may be called as an expert to testify about the discrepancies "between his accounting results performed for CASI with the accounting results achieved by Belinda Riley." (Id.) Counsel, however, did not call Spitz to testify.

[3] Deborah Dunlevy was a bookkeeper hired to perform accounting services for CASI sometime in 2004. (Dunlevy Decl. at 2 ¶ 6.) She assisted Petitioner's counsel during Petitioner's trial and was present in the courtroom. (Tr. at 1163). The trial record shows that Petitioner's counsel attempted to call Dunlevy to the stand as an expert witness to authenticate Petitioner's MasterCard records,(Tr. at 1174), however, the Court denied counsel's request due to late notice of expert testimony. (Tr. at 1173.) Ultimately, the parties stipulated that the credit card records were in fact Petitioner's personal credit card records, and thus Dunlevy's expert testimony became moot. (Tr. at 1176.)

9

her expertise as an accountant due to her handling of the CASI audit. For example, Petitioner's counsel was able to attack Riley on (1) how she calculated salary and loans with respect to both Petitioner and other CASI employees (Tr. at 606-618, 710-732, 788-807), (2) whether meals were in fact allowable expenditures (Tr. at 769-778), (3) whether rent may have been negotiated to be an "indirect cost" in an audit resolution (Tr. at 746), and (4) why Petitioner was denied the right to a post-audit resolution to challenge the unallowable expenditures (Tr. at 809-810).

Had counsel called defense experts Spitz or Dunlevy as witnesses in his case, he would have opened them up to cross-examination about CASI's bank and credit card expenditures under the ATP Grant. These expenditures, which were for unallowable purposes under the Grant, and in excess of $5,000, were made willfully and knowingly in clear violation of 18 U.S.C. § 666. For example, the evidence showed that Petitioner drew a total of thirty checks from the CASI bank account, payable to herself, for $2,000 each (id.; Tr. at 530, 533-34), containing notations designating each as rent payments, eighteen of which contained notations designating them as back rent for months prior to the Grant's October 1, 2001 start date (Gov't Ex. 81; Tr. at 755-57). Therefore, counsel's decision to attack Riley's expert testimony and Government Exhibit 114 by cross-examination of Riley, in lieu of calling Dunlevy or Spitz, was a reasonable legal trial strategy in light of the circumstances. See Cuevas v. Henderson, 801 F.2d 586, 590 (2d Cir. 1986) (courts should not "second guess matters of trial strategy simply because the chosen strategy was not successful) (quoting Trapnell v. United States, 725 F.2d 149, 155 (2d Cir. 1983)).

  **b.**  **Counsel Failed to Impeach The Government's "Key Witness"**

Petitioner next argues that her counsel was ineffective because he did not impeach the Government's "key witness," former CASI employee Joan Hayes, who Petitioner characterizes

as hostile to her. (Reply at 18.) Additionally, Petitioner argues that counsel failed to object to the admittance of Government Exhibit 114 into evidence and/or "confront issues" with respect to that exhibit. (Reply at 17; Pet'r Mem. at 95.) These arguments are also without merit. As an initial matter, the Government did not call Hayes to testify and had no obligation to do so. Therefore, Petitioner's trial counsel would have had to call Hayes as her own witness and take the chance that the Court would allow cross-examination of her as an adverse witness based on her demeanor on the witness stand. Instead, counsel elected to illicit from other witnesses that Hayes, as CASI's accountant, Petitioner's personal accountant and CASI's independent auditor, was "wearing multiple hats," (Tr. at 887, 903, 1014-15, 1040-41), and as such, counsel attempted to persuade the jury that Hayes may have improperly kept CASI's books and records on which Riley's audit relied. Secondly, trial counsel had no reason to call Hayes as she only worked for Petitioner during a portion of the Grant period in which the expenditures were made. (Tr. at   Since Hayes left CASI's employ before the Grant was terminated, she could not testify to any curative steps Petitioner may have taken to rectify any missteps, nor could she confirm that any changes Petitioner made to the CASI's budget were in final form. Thus, the decision to not call Hayes was reasonable under the circumstances confronting Petitioner's trial counsel.

### c. Counsel's Preparation For Trial

Petitioner argues that her counsel was inadequately prepared for trial because of his alleged refusal to "do any preparation on this case until he was paid," and due to his alleged computer illiteracy(Pet'r Mem. at 84.) First, Petitioner's characterization of her counsel's pre-trial conduct is inconsistent with Court minutes and counsel's correspondence with the Court which document counsel's efforts well before his receipt of his full retainer and the trial's June 2, 2008 start date. (See Letter to Judge Patterson Regarding Request for Additional Discovery dated

Aug. 8, 2007, Gov't Mem. Ex. A; Order to Retrieve and Copy Certain Files Stored on Electronic Storage Devices, ECF No. 16; Letter to Compel 404(b) Evidence dated May 12, 2008, ECF No. 38.) Second, failure to pay legal fees or counsel's motion to withdraw for his client's failure to pay, without more, does not give rise to a conflict of interest of the type which would establish ineffective assistance. United States v. O'Neil, 118 F.3d 65, 71-72 (2d Cir. 1997). Third, Karron's allegations regarding her counsel's technological literacy is insufficient to amount to ineffective assistance where counsel's conduct during trial showed he was well-prepared to question the Government's witnesses and advance his defense theory.

### B. Petitioner's Brady Claims

### 1. Procedural Default

Petitioner also claims that the Government failed to disclose exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). As an initial matter, Petitioner's trial counsel was not her appellate counsel and Petitioner's appellate counsel failed to raise these claims on direct appeal. Therefore, Petitioner is procedurally barred from raising these claims in the instant motion. "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice or that he is actually innocent." Bousley v. United States, 523 U.S. 614, 622 (1998) (internal quotations and citations omitted); Marone v. United States, 10 F.3d 65, 67 (2d Cir. 1993) (cause "must be something external to the petitioner, something that cannot be fairly attributed to him." (quoting Coleman v. Thompson, 501 U.S. 722, 753 (1991)) (emphasis in original)). There is no record of Petitioner raising her Brady claims on direct appeal to the Second Circuit, nor has Petitioner indicated that any external factors prevented her from raising those claims on direct appeal.

### 2. Petitioner's Claim of Exculpatory Documents

Nonetheless, Petitioner's <u>Brady</u> claims are without merit. Petitioner merely asserts that Government Exhibit 114 provides implicit evidence that NIST approved his budget reclassifications through alleged inconsistencies in that exhibit. (Pet'r Mem. at 36.) Similarly, Petitioner argues that "evidence . . . <u>must</u> exist to support the reclassification." (<u>Id.</u> at 66 (emphasis added).) Petitioner, however, points to nothing in Exhibit 114 or any other exhibit to support her highly speculative assertion that exculpatory documents must exist, nor does she provide affidavits containing any factual support for this allegation. Mere speculation is not sufficient to support a claim for a <u>Brady</u> violation. <u>See</u>, e.g., <u>Ferguson v. Walker</u>, No. 00 Civ. 1356 (LTS), 2002 WL 31246533 at *13 (S.D.N.Y. Oct. 7, 2002); <u>Harris v. United States</u>, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998). Furthermore, the Department of Commerce OIG's review of the Grant file yielded no exculpatory evidence.[4] (Declaration of SA Rachel Ondrik dated July 15, 2011 ("Ondrik Decl.") ¶ 3.)

Petitioner argues that Snowden destroyed correspondence with Petitioner which was exculpatory in nature. (Reply at 3.) Specifically, Petitioner points to portions of the trial transcript where Snowden admits to discarding financial status reports. (Tr. at 420.) A review of the transcript reveals that Snowden testified that she received these reports and notified Petitioner that she had submitted "inconsistent and inaccurate" financial status reports, which Petitioner would then correct and resubmit. (Tr. at 419.) Snowden testified that she would "put this [inaccurate report] in the file, make a note to it, and then when a new [corrected,

---

[4] The Government found no exculpatory evidence that provides any support for Petitioner's claim that NIST approved of her alleged budget reclassifications. (Gov't Mem. at 22.) Moreover, the Government "offered defense counsel the opportunity to inspect the original copies of all documents in the Government's possession, custody, or control," including the complete Grant file, but counsel never availed himself of that opportunity. (Gov't Mem., Ex. A at 1-2.)

13

resubmitted] form came in . . . just discard the old form and put in the correct form." (Id. at 420.) Thus, nothing in the record suggests, nor does Petitioner provide any affidavits containing factual support ,that Snowden destroyed exculpatory evidence.

### 3. Petitioner's Claim of OIG Agent Intimidation

Lastly, Petitioner argues that OIG agents intimidated and coerced witnesses into not testifying at trial. (Pet'r Mem. at 71, 73.) Petitioner contends that these witnesses would have provided exculpatory evidence were it not for the agent's improper actions. (Id.) Once again, Petitioner does not provide any factual support for her allegations of improper conduct. Her speculative accusations are not supported by affidavits from any of the non-testifying witnesses who were allegedly intimidated by OIG agents. SA Rachel Ondrik submitted an affidavit stating that none of the witnesses interviewed were coerced, threatened, intimidated or persuaded into not testifying at trial. (Ondrik Decl. ¶¶ 4-5.) Petitioner's only support for her allegation is an affidavit submitted three years after her trial by Lee H. Goldberg, a character witness who in fact testified at trial, who states that during his interview on October 25, 2004 he felt intimidated by OIG agents because he believed the agents "to be in a hands-ready stance that would allow them to quickly draw weapons." (Aff. of Lee H. Goldberg dated Sept. 12, 2011, Reply Ex. G ¶ 4.) Since Mr. Goldberg testified at trial, he was clearly not intimidated by the alleged actions of the agents.

In sum, Petitioner's arguments are entirely speculative and unsubstantiated. Accordingly, Petitioner's Brady claims are without merit.

## C. Actual Innocence

A Petitioner can bypass the procedural bar of failing to raise claims on direct appeal if he can demonstrate "actual innocence." Bousley, 523 U.S. at 623. "To establish actual innocence,

14

petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Schlup v. Delo, 513 U.S. 298, 327-328 (1995) (internal quotations omitted). For an actual innocence claim to prevail, a petitioner must present "new reliable evidence . . . that was not presented at trial." Id. at 324. Petitioner does not point to any new evidence which would demonstrate actual innocence. Petitioner merely points to Dunlevy's accounting reconstruction discussed supra, (See Reply at 26-27), from which reconstruction Dunlevy concludes that she "has not found any evidence of fraud" (Id. Ex. D ¶11). Petitioner's remaining arguments all revolve around purported, but unspecified, discrepancies she claims exist in Government Exhibit 114. (Id. at 27-30.) In light of the evidence that the Government presented at trial, even were the Court to accept such "discrepancies" as new evidence, Petitioner's arguments do not meet the standard, that "it is more likely than not that no reasonable juror would have convicted [Petitioner]." Schlup, 513 U.S. at 327. Petitioner's actual innocence claim is therefore without merit.

## V.     Conclusion

For the reasons set forth above, Petitioner's motion to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255 is denied. No hearing is necessary, as "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; Armienti v. United States, 234 F.3d 820, 822-23 (2d Cir. 2000).

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962). As the Petitioner makes no substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. See 28 U.S.C. § 2253.

15

IT IS SO ORDERED.

Dated: New York, New York
      May 3, 2012

                                                Robert P. Patterson, Jr.
                                                       U.S.D.J.

Copies of this order were faxed to:

*Counsel for Defendant:*
Daniel B. Karron
348 East Fulton Street
Long Beach, NY 11561
PRO SE


*Counsel for the U.S.A.*
Christian R. Everdell
U.S. Attorney's Office, SDNY (St Andw's)
One St. Andrew's Plaza
New York, NY 10007
(212)637-2200